UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. SACR 06-39-AG |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS |
| JOHN WILLIAM DOBLE, | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

Defendant John William Doble ("Defendant") has filed a Motion to Suppress Statements and Evidence after he was indicted for possession of a firearm by a felon.  After the Government filed an Opposition and Defendant filed a Reply, there was a hearing on January 15, 2008, with testimony from four police officers and from Defendant.  The Motion is GRANTED.

**FACTUAL BACKGROUND**

The Court finds the following facts based on the evidence filed by both sides in this Motion, on the testimony at the hearing, and on the Court's evaluation of witness credibility.  On February 7, 2006, at approximately 5:00 a.m., five officers of the Buena Park Police Department were dispatched to Defendant's house in Buena Park.  A 911 operator informed the officers that a woman had called 911 and reported that her husband was getting violent.  (Wolf Declaration,

Exhibit 2, 1:19-20.)  The operator further informed the officers that the wife said there was a rifle in the back bedroom of the house, and that the husband was inside the house with a key to that bedroom.  (*Id.* at 3:21-23; 4:18-19.)  The operator informed the officers that there was a three-year-old child in the front bedroom of the house.  (*Id.* at 4:17-19.)  At 5:13 a.m., the operator informed the police officers that the "male half" of the domestic dispute was on the line with the operator.  (*Id.* at 5:22-23.)  The man on the line, Defendant in this case, confirmed to the 911 operator that there was a shotgun in the bedroom.  (*Id.* at 5:27 - 6:3.)  Officer Morison asked the operator to tell Defendant to step outside.  (*Id.* at 5:24-25.)  The operator did so, and told him to keep his hands where the officers could see them.  (*Id.* at 6:4-10.)

When Officer Mark Morison, the lead officer, arrived on the scene, Andrea Doble, Defendant's wife, was outside the house.  (Morison Declaration ¶ 3.)  She informed Officer Morison that she and Defendant were having marital problems and had a divorce hearing scheduled soon.  (*Id.*)  She informed him that as she was getting ready for work that morning, Defendant had come home angry, grabbed her by the jaw, and grabbed her by the throat with both hands, lifting her off the couch where she had been sitting.  (*Id.*)

The Defendant then stepped outside of the house.  When Defendant stepped outside, he saw two police cars in front of his house and five police officers with their guns drawn.  The police officers immediately addressed him.  (Doble Declaration ¶ 5.)  According to Defendant, the officers used a "loud and commanding tone of voice" to summon him.  (*Id.*)  According to testimony at the hearing, the police officers ordered Defendant to put his hands in the air and to turn his back to them.  The police officers ordered Defendant to walk backwards toward the sound of their voices.  The police officers did not threaten Defendant or curse at him, and yelled at him only to show him where they were.  Defendant was cooperative and non-confrontational.  (*Id.* ¶ 5.)  When Defendant reached the two closest police officers, Officer Morison and Officer Ackerman, Officer Morison patted him down.

At this point, the testimony of the multiple witnesses diverges significantly.  The Court finds, based on the testimony of Defendant and one of the officers, that Defendant was placed in

2

1   handcuffs immediately after the pat-down search.  Officer Morison then asked Defendant to "tell

2   . . . his side of the story."   (Morison Declaration ¶ 5.)   Defendant told Officer Morison a story

3   similar to that told by Andrea Doble, except that Defendant did not admit to any physical

4   violence.  (*Id.* ¶ 5.)

5          Officer Morison believed that California law required him to take temporary custody of

6   the firearm, and told Defendant that Officer Morison had to get the gun.  Officer Morison stated

7   in his Declaration, "Officer Ackerman and I asked defendant if we could go in and retrieve the

8   weapon and where the firearm was located." (Morison Declaration ¶ 6.)  Defendant gave

9   Officer Morison permission to get the gun, informed Officer Morison that he would need a key

10  to get to the gun, and gave the key to Officer Morison.  (*Id.*)

11         Officer Ackerman went into the back bedroom of the house and retrieved a shotgun.

12  Defendant was placed in the back seat of Officer Morison's patrol car.  (Morison Declaration

13  ¶ 7; Doble Declaration ¶ 7.)

14

15  **ANALYSIS**

16

17         Defendant moves to suppress the statements he made to officers after he came out of his

18  house, as well as the shotgun found in his house.  Defendant asserts that his *Miranda* rights were

19  violated, his statements to the officers were involuntary, and his consent to search his house for

20  the shotgun was invalid.

21

22         **1.       DEFENDANT'S STATEMENTS**

23

24         Defendant moves to suppress the statements he made to the officers.  He argues that his

25  *Miranda* rights were violated because he did not receive a *Miranda* warning before he spoke

26  with the officers outside his house.  The Government does not claim that there was a timely

27  *Miranda* warning.  Instead, the Government argues that Defendant's statements are admissible

28  even if Defendant did not receive a *Miranda* warning.

1

### 1.1    Custodial Interrogation

2

3        First, the Government argues that Defendant was not in police custody when he made the

4    statements to the police officers.  In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the Supreme

5    Court held that the government must advise a defendant of certain legal rights before beginning

6    custodial interrogation.  *Miranda* rights do not apply if a defendant is not in custody.  The

7    Government contends that Defendant was not in custody when he spoke with the officers outside

8    his house.

9        An individual is in custody if, considering the circumstances surrounding an

10   interrogation, a reasonable person "would have felt he or she was not at liberty to terminate the

11   interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  Stated differently,

12   the inquiry is whether there was a "'formal arrest or restraint on freedom of movement' of the

13   degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per

14   curiam*) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curiam*)).

15       Cases have made clear that mere "detention" does not constitute custody for *Miranda*

16   purposes.  For instance, a traffic stop is not custody. *Berkemer v. McCarty*, 468 U.S. 420, 440

17   (1984).  Nether is a *Terry* stop-and-frisk. *United States v. Bautista*, 684 F.2d 1286, 1291 (9th

18   Cir. 1982).  Even "[h]andcuffing a suspect does not necessarily dictate a finding of custody."

19   *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 2005).  Accordingly, the particular facts of

20   a case must be reviewed.

21       In *Booth*, 669 F.2d at 1236, the Ninth Circuit stated that handcuffing a suspect does not

22   necessarily dictate a finding of custody, because the government can take "[s]trong but

     reasonable measures to insure the safety of the officers or the public."  Further, where a suspect

23   "threatens physical danger or flight, officers may use handcuffs in the course of a *Terry* stop."

24   *United States v. Cervantes-Flores*, 421 F.3d 825, 830 (9th Cir. 2005).  But without such special

25   circumstances, handcuffing a suspect converts a stop into an arrest. *See United States v.

26   Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) ("[H]andcuffing substantially aggravates the

27   intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry*

28

1   stop.").

2        The officers in this case did a commendable job of controlling the Defendant in the

3   interests of safety and thus removing the threat of physical danger or flight.  Defendant

4   cooperated with the police in exiting his house and walking backwards with his hands raised.

5   Five officers surrounded him with guns drawn.  If Defendant had been carrying a shotgun, it

6   likely would have been visible, and a pat-down search confirmed that he was unarmed.  Using

7   handcuffs in that circumstance constituted a formal arrest or restraint on Defendant's freedom of

8   movement of the degree associated with formal arrest.  No reasonable person who was called out

9   of his house at the crack of dawn, was surrounded by five officers with guns displayed, and was

10  told to raise his hands and walk backward before being handcuffed would feel free to terminate

11  the investigation and leave.  *See U.S. v. Hernandez*, 476 F.3d 791, 796 (9th Cir. 2007) (finding

12  custodial interrogation even where defendant was not handcuffed, when he was ordered out of

13  car, surrounded by six California Border Patrol officers, ordered to place his hands on top of the

14  vehicle, and subjected to a pat-down).  Accordingly, Defendant was in custody for *Miranda*

15  purposes when he was interrogated.

16

17        **1.2     Public Safety Exception**

18

19        The Government next argues that, even if the Defendant was in custody when questioned,

20  the questioning is admissible under the narrow public safety exception to the *Miranda* warning

21  requirement.  For the public safety exception to apply, there must have been "an objectively

22  reasonable need to protect the police or the public from any immediate danger associated with

23  [a] weapon."  *New York v. Quarles*, 467 U.S. 649, 658, 659 n.8 (1984).  "This exception allows

24  officers, when reasonably prompted by a concern for the public safety, to engage in limited

25  questioning of suspects about weapons in potentially volatile situations."  *U.S. v. Martinez*, 406

26  F.3d 1160, 1164 (9th Cir. 2005).  In *Quarles*, the public safety exception applied because the

27  police officers knew that a gun had been left somewhere in a supermarket, and was a potential

28  danger to people in the store.

1    The Ninth Circuit public safety exception case most similar to the current case is

2    *Martinez*.  In that case, the district court relied on the public safety exception to deny a motion to

3    suppress un-*Mirandized* statements made about weapons found at the scene of a domestic

4    violence incident.  *Id.* at 1165-66.  There, a police officer was dispatched to a house in response

5    to a domestic violence call.  When he arrived at the house, he found a crying woman in the front

6    yard, and heard "hostile yelling" coming from inside the house.  *Id.* at 1163.  The officer entered

7    the house, passed a young boy, and found the yelling man in a bedroom.  He asked the man to

8    move into the living room "where [they] could figure out what was going on."  *Id.*  Once in the

9    living room, the officer noticed two rifles and a shortened barrel shotgun resting on the couch.

10   He immediately asked, "What are those doing there?" and the man responded that he knew the

11   police were coming and he was trying to get rid of the weapons before they arrived.  *Id.*  The

12   Ninth Circuit held that the district court correctly denied the motion to suppress those

13   statements.

14       The case at hand does not present an immediate emergency like that present in *Martinez*.

15   In that case, the police officer was in a living room with an upset man who had not been

16   handcuffed or subdued.  The man had access to the three weapons in the room.  The officer was

17   entitled to ask about the weapons to determine if they posed an immediate threat to safety.  In

18   contrast, the officers in this case had commendably controlled the situation before the

19   questioning, alleviating concerns about safety.  They had been previously been informed that the

20   gun in the house was behind a locked door.  The Defendant was under control outside the house,

21   and his wife was outside the house as well.  The shotgun in the locked back bedroom did not

22   constitute an emergency justifying the failure to give the simple, brief *Miranda* warning.  *See*

23   *United States v. Williams*, 435 F.3d 1148, 1159 (9th Cir. 2006) ("[T]here is rarely, if ever, a

     legitimate reason to delay giving a *Miranda* warning . . . .").

24       This Court recognizes that the "volatility of situations involving domestic violence make

25   them particularly well-suited for an application of the emergency doctrine," and that domestic

26   violence calls pose a particular danger to police officers.  *Martinez*, 406 F.3d at 1164.  Still, the

27   Court finds that there was not the requisite threat of immediate danger when Defendant was

28

6

questioned about the shotgun.  Accordingly, Defendant's statements are not admissible under the public safety exception to *Miranda*.

### 1.3     Voluntariness

Defendant argues that, even if his statements are not excluded under *Miranda*, his statements should be suppressed because they were made involuntarily.  Because the Court has found that Defendant's statements *were* obtained in violation of *Miranda*, the Court will not address this argument here.

### 1.4     Conclusion

The Court GRANTS the Motion as to Defendant's statements to the officers.

## 2.     THE FIREARM

Defendant moves to suppress the firearm found when the officer went into Defendant's home.  Defendant argues that there was no warrant to search his home, and that the seizure of the shotgun violated the Fourth Amendment.  The Government does not claim there was a warrant, but argues that the shotgun is admissible under an exception to the warrant requirement.

The Government bears the burden of showing that the conduct of the police officers was within a recognized exception to the warrant requirement.  *United States v. Linn*, 880 F.2d 209, 214 (9th Cir. 1989), *overruled on other grounds by Florida v. White*, 526 U.S. 559, 563 (1999).  "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *United States v. United States District Court*, 407 U.S. 297, 313 (1972).  Searches and seizures inside a home without a warrant "are presumptively unreasonable," and the police bear a "heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests."  *Welsh v. Wisconsin*, 466 U.S. 740, 749-

50 (1984).

### 2.1 Consent

The Government argues that the shotgun is admissible as evidence because Defendant consented to the search of his home.  Although the Fourth Amendment generally prohibits the warrantless entry of a person's home, "one of the specifically established exceptions to the [warrant requirement] is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  The Government must show that the consent was "freely and voluntarily given." *Pavao v. Pagay*, 307 F.3d 915, 918-19 (9th Cir. 2002); *see also Bumper v. North Carolina*, 391 U.S. 543, 548 (1968).

Whether a consent to a search was voluntarily given "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227.  Consent is not voluntary when "it was coerced by threats or force." *Id.* at 233.  Defendant's consent in this case was coerced by a show of force.  Accordingly, his consent was not voluntary.

Ninth Circuit cases have identified five factors to be considered in determining whether a consent to a search resulted from coercion.  They are "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989). In this case, as determined, Defendant was in custody.  The officers had confronted him outside his house with their guns drawn.  *Miranda* warnings were not given, and Defendant was not notified that he had a right not to consent to the search. These factors all indicate that Defendant's consent was not voluntary.  Finally, Defendant had not been told that a search warrant could be obtained.  While this last factor weighs for the voluntariness of Defendant's consent, *see United States v. Kim*, 25 F.3d 1426, 1432 (9th Cir. 1994) (threatening a defendant with a search warrant intimates that "withholding of consent would ultimately be futile"), the

1   factors taken as a whole show that Defendant's consent was the product of a show of police

2   force, and was not truly voluntary.  Accordingly, the shotgun is not admissible under the consent

3   exception to the Fourth Amendment.

4

5          **2.2      Emergency Exception**

6

7          The Government next argues that the Officer Ackerman's entry into the house to retrieve

8   the shotgun was authorized under the emergency exception to the warrant requirement.  The

9   emergency exception has three requirements: (1) that the police have reasonable grounds to

10  believe that there is an emergency at hand and an immediate need for their assistance for the

11  protection of life or property; (2) that the search is not primarily motivated by intent to arrest and

12  seize evidence; (3) that there is some reasonable basis, approximating probable cause, to

13  associate the emergency with the area or place to be searched.  *United States v. Martinez*, 406

14  F.3d 1160, 1164 (9th Cir. 2005).

15         Here, the Court has already determined that the officers had commendable control of the

16  situation, so that there was not an emergency at hand or an immediate need for further officer

17  action.  Thus, the shotgun is not admissible under the emergency exception to the warrant

18  requirement.

19

20         **2.3      California State Law**

21

22         Lastly, the Government argues that California law mandated that, upon discovery of the

23  firearm, the officers take temporary custody of it for a minimum of forty-eight hours.  *See* Cal.

    Penal Code § 12028.5.  California Penal Code § 12028.5 provides:

24

25                  [An officer] at the scene of a domestic violence incident involving a threat

26                  to human life or a physical assault, shall take temporary custody of any

27                  firearm or other deadly weapon in plain sight or discovered pursuant to a

28                  consensual search as necessary for the protection of the peace officer or

                                                    9

1    other persons present.

2    This statute does not apply to the situation presented in this case.  In this case, the firearm was

3    not in plain sight and was not discovered pursuant to a valid consensual search.  Thus, this

4    statute does not allow admission of the shotgun into evidence.

5

6              **2.4     Conclusion**

7

8         The Court GRANTS the Motion as to admission of the firearm.

9

10   **DISPOSITION**

11

12        Defendant's Motion is GRANTED.

13

14

15   IT IS SO ORDERED.

16   DATED: January 22, 2008

17

18                                    _____

19                                         Andrew J. Guilford

20                                    United States District Judge

21

22

23

24

25

26

27

28